**Walter Clifton McNEILL, Appellant,**

v.

**Earl L. BUTZ, Secretary of Agriculture, et al., Appellees.**

**Delores S. CANADY, Appellant,**

v.

**Earl L. BUTZ, Secretary of Agriculture, et al., Appellees.**

Nos. 72–2319, 72–2320.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1973.

Decided June 11, 1973.

Charles B. Winberry, Rocky Mount, N. C., and Stephen H. Nimocks, Fayetteville, N. C. (Biggs, Meadows & Batts, Rocky Mount, N. C., and Anderson, Nimocks & Broadfoot, Fayetteville, N. C., on brief), for appellants.

Jack B. Crawley, Jr., Asst. U. S. Atty. (Thomas P. McNamara, U. S. Atty., on brief), for appellees.

Before WINTER and CRAVEN, Circuit Judges and BRYAN,* District Judge.

WINTER, Circuit Judge:

Walter Clifton McNeill and Delores S. Canady, each of whom was a discharged employee of the Department of Agriculture, sued to effect their reinstatement to their prior federal employment and to recover back pay. In each case, the claim for relief was predicated upon the contention that the Department of Agriculture had violated plaintiff's right to procedural due process in discharging him without permitting him the opportunity to confront and cross-examine his accusers. The district court granted summary judgment for the government in both cases because, (1) in McNeill's case, the record indisputedly showed, by his own admission, that he engaged in illegal activities which justified his discharge, and (2) in Canady's case, she had no right to a hearing at which she could confront and cross-examine her accusers, or in the alternative, that the government's interest in her prompt and

* Sitting by designation.

orderly discharge outweighed her right to this aspect of procedural due process.

We agree with respect to McNeill, and we therefore affirm in No. 72–2319. We disagree with respect to Canady and, hence, we reverse in No. 72–2320, and remand with directions to order her reinstatement and to assess damages.

I.

A. *McNeill's Case*: McNeill was employed as a Compliance Supervisor for the Cumberland County, North Carolina office of the Agricultural Stabilization and Conservation Service (ASCS). He had held this position full-time for ten years and part-time for the four preceding years. He was a non-civil service employee who had no employment contract.

In 1969, an audit report prepared by the Inspector General of the Department of Agriculture disclosed certain irregularities in the Cumberland County ASCS office. The Inspector General conducted a further investigation and assembled his findings in two reports. These investigative reports named McNeill and Canady as malefactors.

On February 16, 1970, the North Carolina State ASCS Committee advised McNeill by letter that he was suspended as of February 17 for "impeding the effectiveness of ASCS program operations . . . and for failure to perform the duties of your employment." 7 C.F.R. 7.29(b). The letter further specified the alleged acts which supported the charges: (1) that he improperly obtained the benefits of a tobacco lease without the agreement of the owner, one McDowell, in contravention of Department of Agriculture regulations which require agreement of the owner and approval by the ASCS county committee; and (2) that he "caused to be prepared" a CAP (Cropland Adjustment Program) agreement which entitled him to annual payments as the operator of a farm he had purchased six months earlier, in contravention of Agriculture regulations which extend CAP benefits only to those who had owned a farm for three years.

On February 25, McNeill requested a hearing, copies of the records pertaining to the investigation, and the right to examine his accusers. On April 8, 1970, the State Committee Office held a hearing at which McNeill made a personal appearance accompanied by counsel. At the hearing, McNeill's counsel denied the allegations. McNeill submitted an affidavit from McDowell which stated that McDowell had agreed to and signed the tobacco lease. McNeill testified and *admitted knowledge of the CAP agreement and receipt of a payment pursuant to it,* but denied that he had caused its preparation. He stated that he would have terminated the CAP agreement had he known it was improper. It does not appear that the government proffered any evidence at the hearing. On April 29, the State Committee upheld McNeill's dismissal.

In May, McNeill appealed his suspension to the Deputy Administrator of the ASCS in Washington, D. C. On July 9, four days before the appeal hearing, the government for the first time furnished McNeill's counsel with selected excerpts of the audit and investigatory reports. These excerpts contained only government-prepared recapitulations of incriminating evidence, but included no affidavits or sworn statements or the identity of McNeill's accusers. At the same time, the government advised McNeill's counsel that he could not examine the government's witnesses. At the hearing, McNeill's renewed requests to examine the government's witnesses and the complete investigative files were denied. McNeill presented four affidavits which tended to confirm his story. Again, it does not appear that the government proffered any evidence. In November, the Deputy Administrator affirmed McNeill's suspension.

Thereafter, the State Committee discharged McNeill and permanently disqualified him from future employment as an ASCS committeeman or employee of the ASCS county committee. 7 C.F. R. 7.29(c). McNeill appealed his discharge to the Deputy Administrator,

who affirmed it. McNeill then brought this suit.

B. *Canady's Case*: Canady was employed as a Production Adjustment Clerk for the Cumberland County ASCS. She had held the position for four years. She, too, was a non-civil service employee who had no employment contract.

After the audit and investigation, the State Committee advised her by letter that she was suspended for "failure to perform the duties of your employment and impeding the effectiveness of the tobacco program." The letter alleged that Canady had mutilated two filed lease agreements, replacing them with agreements which contained erroneous information. On February 25, and again on March 27, Canady requested a hearing, copies of the records pertaining to the investigation, and an opportunity to confront her accusers. On April 1, the government advised that it would not make the investigative report available to her. On April 2, Canady again requested an opportunity to confront the witnesses against her, but the request was denied.

At the April 8 State Committee hearing, Canady testified, denying the specific allegations. Her renewed request to confront the government's witnesses was again rejected. It does not appear that the government presented any sworn or other evidence. At no time did it disclose the identity of her accusers.

The State Committee upheld Canady's dismissal. She appealed to the Deputy Administrator and again requested both confrontation and copies of the investigation and audit reports. On July 9, the government for the first time furnished her with selected excerpts of the reports, but denied her request for confrontation. Like those furnished McNeill, the excerpts contained only secondhand recapitulations of incriminating evidence, but not the identity of any government witnesses.

At the July 13 appeal before the Deputy Administrator, Canady placed in evidence her affidavit denying the specific allegations. The government proffered those excerpts from its investigative report which it had made available to Canady. On November 12, her appeal was denied. Thereafter, the State Committee discharged her and disqualified her from future employment as an ASCS committeewoman or as an employee of an ASCS county committee. The Deputy Administrator denied Canady's subsequent appeal of her discharge. She then commenced this action.

## II.

The fifth amendment enjoins the federal government from depriving any person of "life, liberty, or property, without due process of law." McNeill and Canady urge that their discharge and permanent disqualification deprived them of liberty and/or property that the fifth amendment's guarantee of procedural due process therefore applied, and that due process required that they be afforded an opportunity to confront and cross-examine their accusers.

■ The first issue presented is whether in these circumstances notions of procedural due process rights are applicable to the dismissal of a non-civil service federal employee who has no employment contract. Procedural due process rights attach where state action condemns a person to "suffer grievous loss of any kind." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); Goldberg v. Kelly, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Cf. Hannah v. Larche, 363 U.S. 420, 441–442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). The Supreme Court has recently addressed the question of procedural due process rights for untenured state employees in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). See Chitwood v. Feaster, 468 F.2d 359 (4 Cir. 1972); Johnson v. Fraley, 470 F.2d 179 (4 Cir. 1972).

*Roth* is controlling in this case. *Sindermann* is only of collateral interest, since it dealt primarily with the question of when a teacher, not having formal tenure, may claim quasi-tenure. No such claim is made in either of the instant cases.

In *Roth,* supra, the Court held that a non-tenured teacher who had been employed for one year had no due process right to a statement of reasons or a hearing on a state university's decision not to renew his one-year contract, because non-renewal deprived him of neither "liberty" nor "property."

 Although the Court held that an ordinary dismissal or failure to reemploy does not infringe the broad guarantee of "liberty," it explained that "[t]here might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated." 408 U.S. at 573, 92 S.Ct. at 2707. The Court suggested that liberty might be implicated if the state made charges against the employee which "might seriously damage his standing and associations in his community," as, for example, accusa-

tions of dishonesty, disloyalty, or immorality. *Ibid.*[1] Thus, "liberty" is implicated and procedural due process is required when government action threatens an employee's good name, reputation, honor, or integrity. *Ibid.* See Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). Secondly, the Court explained that government dismissal may abridge liberty if it imposes a "stigma or other disability" which forecloses a discharged employee's freedom to take advantage of other employment opportunities. 408 U.S. at 573, 92 S.Ct. 2701.[2]

 Applying these standards, we conclude that both McNeill and Canady had a right to some form of procedural due process because the government's discharge for cause deprived them of "liberty" in the constitutional sense. The government accused McNeill of improperly obtaining the benefits of a lease and improperly procuring annual CAP payments. Neither averment states merely a technical violation of Agriculture Department regulations. On the contrary, the charges imply that

1. This rule may have the ironic effect of encouraging the government to dismiss employees without articulating reasons, thereby increasing the opportunity for official arbitrariness or caprice, which is anathema to the due process clause. See Vitarelli v. Seaton, 359 U.S. 535, 538, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), where the Interior Department first dismissed an employee for security reasons, and then, in order to avoid the more rigorous procedural requirements applicable to dismissals for security reasons, withdrew this notification and replaced it with one that omitted any reference to the reasons for dismissal. Cf. Cafeteria Workers v. McElroy, 367 U.S. 886, 899–901, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (Brennan, J., dissenting). But at least if it does, the opportunities of a discharged employee to obtain future employment will be less embarrassed than if he were discharged for reasons impugning his good name, reputation, honor or integrity.

2. Similarly, the Court did not foreclose the possibility that government dismissal

of a non-tenured employee may infringe his protected "property" rights. For procedural due process rights to attach, the non-tenured employee must have more than an abstract need, desire, or unilateral expectation of future employment, he must have "a legitimate claim to entitlement to it." 408 U.S. at 577, 92 S.Ct. at 2709.

The companion case, Perry v. Sindermann, supra, held that the absence of a contractual or tenure right to reemployment does not necessarily defeat a teacher's claim to procedural due process. In so holding, the Court further refined the constitutional concept of property: "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." 408 U.S. at 601, 92 S.Ct. at 2699. But the employee must prove more than his "subjective 'expectancy'" to establish the requisite understandings. *Id.,* at 603, 92 S.Ct. 2694.

McNeill defrauded a farm owner and the government. Similarly, the government accused Canady of substituting erroneous or fraudulent documents for ones she had mutilated. Again, the charges smack of deliberate fraud. These relatively serious accusations in effect allege dishonesty and thereby impugn plaintiff's good name, reputation, honor, and integrity. *Roth* teaches that the fifth amendment would enjoin the government from so stigmatizing a dismissed employee without providing at least rudimentary due process, unless, of course, as we hereafter discuss with regard to McNeill, the dismissed employee admits his guilt.[3] 408 U.S. at 573, 92 S.Ct. 2701. See Peters v. Hobby, 349 U.S. 331, 351, 75 S.Ct. 790, 99 L.Ed. 1129 (1955) (Douglas, J., concurring); *Johnson*, 470 F.2d at 185 (Boreman, J., concurring).

The State Committee permanently disqualified both plaintiffs from future ASCS employment. *Roth* advised that if the state university in that case had barred the teacher from "all other public employment in state universities . . ., this . . . would be a different case. For '[t]o be deprived not only of present government employment but of future opportunity for it is no small injury.'" 408 U.S. at 573, 92 S. Ct. at 2707, quoting Joint Anti-Fascist Refugee Committee, 341 U.S. at 185, 71 S.Ct. 624 (Jackson, J., concurring). No proof was adduced at trial regarding the plaintiffs' future employment prospects. Although disqualification from ASCS may be a rather narrow disability, we can safely surmise that the stigma attached to such disqualification will effectively foreclose other government employment opportunities.[4] We think it fair to assume that plaintiffs' private employment prospects will also be prejudiced. *Roth* cautions that "[m]ere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" 408 U.S. at 574 n. 13, 92 S.Ct. at 2707. But that warning was written in the context of a facially neutral failure to re-employ. Therefore, ASCS disqualification may present the type of stigma or disability which *Roth* contemplated would deprive a discharged untenured employee of liberty. See Snead v. New York City Dept. of Social Services, 355 F.Supp. 764 (S.D.N.Y. 1973). However, since the undeveloped state of the record compels us to base our analysis more on supposition than on established facts, we decline to rest our decision that procedural due process rights attach solely on the ground of loss of future employment opportunities. Nevertheless, it seems certain that more than loss of good name, reputation, honor, and integrity is at stake.

■ Although we agree with the plaintiffs' contention that their dismissal deprived them of constitutionally protected "liberty," we reject their contention that they were deprived of "property" in the constitutional sense. Neither had an employment contract. Neither had any form of tenure. Although McNeill had served fulltime for ten years and Canady for four, longevity alone does not establish tenure. *Sindermann*, 408 U.S. at 601–602, 92 S.Ct. 2694; *Johnson*, 470 F.2d at 181; *id.*, at

---

3. *Cafeteria Workers*, supra, is not contrary. It held that in certain circumstances the government need not provide notice and hearing before barring for security reasons an employee, who had no contract, from a concession which her employer operated on a sensitive military installation. Although this holding circumscribed the form of process due an employee in these circumstances, the majority implicitly assumed that procedural due process rights did at least in theory attach. *Id.*, 367 U.S. at 899–900, 81 S.Ct. 1743 (Brennan, J., dissenting). See infra pp. 323–325.

4. Indeed, we were advised in oral argument that the government is the major employer in Cumberland County, plaintiffs' community of residence. Hence, disqualification from ASCS may effectively foreclose a significant percentage of the job opportunities available in their community.

184 (Boreman, J., concurring). Neither plaintiff presented a scintilla of evidence demonstrating the requisite mutually explicit understanding with ASCS which might have supported a claim of entitlement to reemployment. *Roth,* 408 U.S. at 576–578, 92 S.Ct. 2701; *Sindermann,* 408 U.S. at 602–603, 92 S.Ct. 2694; *Chitwood,* 468 F.2d at 360.

In short, we conclude that in dismissing plaintiffs for the acts charged, the government deprived them of "liberty" by stigmatizing their standing and associations in the community. Therefore both had a fifth amendment right to procedural due process in some form, absent which the government could not discharge and disqualify them from ASCS service.

### III.

Since we decide that plaintiffs had a right to procedural due process, we turn to the issues of the scope of the right, what it encompasses, and how it was denied. Both plaintiffs received notice, a hearing, and two appeals, but neither had an opportunity to learn the identity of, to confront, and to cross-examine his accusers. The government did supply them with excerpts from its investigative and audit reports, but did so only after the hearings before the State Committee.

██ Procedural due process is a necessary concomitant of a democratic government's obligation to practice fairness. Joint Anti-Fascist Refugee Committee, 341 U.S. at 170, 71 S.Ct. 624 (Frankfurter, J., concurring); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). However, the requirements of procedural due process may flexibly be adapted to the demands of particular contexts. Joint Anti-Fascist Refugee Committee, 341 U.S. at 162–163, 71 S.Ct. 624; Morrissey v. Brewer, 408 U.S. at 481, 92 S.Ct. 2593. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria Workers, 367 U.S. at 895, 81 S.Ct. at 1748. Goldberg v. Kelly, 397 U.S. at 263, 90 S.Ct. 1011.

In various civil settings, the Supreme Court has stressed the critical nature of the right to confront and cross-examine adverse witnesses.[5] In Goldberg v. Kelly, supra, the Court held that due process requires a state to permit a welfare recipient to confront and cross-examine adverse witnesses before it can terminate his welfare benefits. *Id.,* at 267–268, 269, 90 S.Ct. 1011. The Court outlined the rudiments of due process, emphasizing the crucial function of confrontation: "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.,* at 269, 90 S.Ct. at 1021. *Goldberg* quoted at length from Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959),[6] a case which held that cross-ex-

---

5. For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.
 5 Wigmore on Evidence (3d ed. 1940) § 1367. Wigmore heralds cross-examination as the "greatest legal engine ever invented for the discovery of truth." *Ibid.*

6. The Court did not reach the constitutional issue in *Greene,* but held only that neither the Executive nor Congress had authorized the Department of Defense to revoke the security clearance of an aeronautical engineer employed by a private firm at a private plant without affording him the procedural safeguards of confrontation and cross-examination. The Court employed the quoted language to explain why it would not lightly find such authorization.

amination was required before a security clearance was revoked and the employee discharged:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination . . . This Court has been zealous to protect these rights from erosion. It has spoken out . . . in all types of cases where administrative . . . actions were under scrutiny.

The Court reaffirmed these principles in Morrissey v. Brewer, supra, which defined the scope of due process for parole revocations. The government must first hold a preliminary hearing soon after the parolee is taken into custody, and then hold a final revocation hearing within a reasonable period. At both hearings, the minimal requirements of due process mandate that the parolee have an opportunity to confront and cross-examine adverse witnesses "unless the hearing officer specifically finds good cause for not allowing confrontation." *Id.*, at 489, 92 S.Ct. at 2604.[7] Thus, *Goldberg* and *Morrissey*, the Court's most recent major elaborations of the minimum requirements of procedural due process,

both signal the importance of confrontation where factual allegations are in dispute.[8]

In Caulder v. Durham Housing Authority, 433 F.2d 998 (4 Cir. 1970), cert. denied 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed.2d 539 (1971), we held that procedural due process required a public housing project to grant at least an informal hearing before it could evict a tenant. We further held that the hearing must include "an opportunity on the part of the tenant to confront and cross-examine adverse witnesses." 433 F.2d at 1004. See Escalera v. New York City Housing Authority, 425 F.2d 853 (2 Cir.) cert. denied 400 U.S. 853, 91 S. Ct. 54, 27 L.Ed.2d 91 (1970).

In applying these governing principles to the circumstances before us, we conclude that the relative natures of the government function and the private interest do not permit the government to discharge these employees without providing notice and a hearing at which the employees can confront and cross-examine the government's informers. In both cases, the propriety of dismissal hinged strictly on factual determination, and the evidence consisted primarily of individual testimony. Thus, these dismissals arise in a context where confrontation and cross-examination are paradigmatically useful in discovering the truth. See *Snead*, supra, 355 F. Supp. at 772.

We do not dispute that the government has a substantial interest in the efficient and orderly discharge of unsatisfactory employees. But this interest does not outweigh the employee's interest in having an effective opportunity to challenge damning evidence and in preserving his job and reputation. As was said in Stanley v. Illinois, 405 U.S. 645,

---

7. In their concurring opinion, Justices Brennan and Marshall rephrased the test: "unless it is specifically found that the witness would therefore be exposed to a significant risk of harm." 408 U.S. at 491, 92 S.Ct. at 2605.

8. See Willner v. Committee on Character & Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963), holding that one seeking admission to the bar to practice law has a due process right to confront witnesses adverse to his admission.

656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972):

> The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy which may characterize praiseworthy government officials.

See Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Cf. Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

Despite its concern for the efficient discharge of derelict employees, the Department of Agriculture has created considerable procedural burdens for itself, even in cases such as these which involve non-civil service employees. See 7 C.F.R. 7.28–7.29. The government expends significant effort to provide a semblance of due process: notice, hearing, appeal. It is evident that this system already occasions considerable governmental inconvenience. The incremental physical burden of presenting the accusing witnesses for cross-examination upon the employee's timely and good faith request would neither be crippling nor add a significant additional burden. We cannot accept the government's contention that efficiency justifies its denial of the very legal device that a wronged employee requires most to preserve his position and good name. Without the right of confrontation, the process provided by the government here is mere "sound and fury, signifying nothing." [9]

The government further urges its interest in protecting and encouraging clandestine informers who will report employee misdeeds. Whatever the wisdom of fostering secret unchallengeable accusations in the government employee context, the cases do recognize this general governmental interest in other contexts.[10] But see Hannah v. Larche, 363 U.S. at 489, 80 S.Ct. 1502 (Frankfurter, J., concurring). Although Morrissey v. Brewer credits the government's interest in protecting informers, it requires a specific finding of "good cause" as a condition to dispensing with confrontation. 408 U.S. at 489, 92 S.Ct. 2593. No such finding was made below. Moreover, if, as the concurring opinion of Justices Brennan and Marshall indicates, see n. 7, supra, the finding of good cause must be based on some degree of danger to the informer, we doubt that it could be made in these circumstances. *Morrissey's* insistence on a specific finding in each case precludes reliance on a general government interest in fostering and protecting secret informers.

Finally, the government relies on Cafeteria Workers v. McElroy, 367 U.S. at 896, 81 S.Ct. 1743, where, in holding that a concession employee could be barred from a military installation for "security" reasons without a hearing, the majority stated: "The Court has consistently recognized that . . . the interest of a government employee in retaining his job, can be summarily denied. It has become a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer." 367 U.S. at 896, 81 S.Ct. at 1749. We are not persuaded that this principle is now as firmly embedded in our jurisprudence as it may have been in 1961, or that the holding in *Cafeteria Workers* necessarily controls our decision.

---

9. W. Shakespeare, MacBeth, Act V, sc. 5, line 19.

10. Compare McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967)

with Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). But cf. Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

First, *Cafeteria Workers* appears to rest to some extent on the supposed dichotomy between privileges and rights. Compare *id.*, at 894 with *id.*, at 895–896, 81 S.Ct. 1743. See A. Bickel, The Supreme Court 1960 Term, Foreword: The Passive Virtues, 75 Harv.L.Rev. 40, 73 (1961). The privilege/right dichotomy has since been discredited. Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593.

Secondly, the cases which *Cafeteria Workers* cited support the quoted proposition, but did not squarely address the issue of procedural due process rights.[11] Although these cases establish the government's power to remove employees, none presented the Court with any opportunity to discuss the restraints which procedural due process might impose on the government.

In Vitarelli v. Seaton, supra, the Court did affirm the government's power to discharge summarily a non-civil service employee without giving a reason. *Id.*, 359 U.S. at 539, 79 S.Ct. 968. But the Court expressly reserved the "question of the constitutional permissibility of an administrative adjudication based on 'confidential information' not disclosed to the employee." *Id.*, at 540 n. 2, 79 S.Ct. at 973. See Greene v. McElroy, supra; Williams v. Zuckert, 371 U.S. 531, 83 S.Ct. 403, 9 L.Ed.2d 486,

vacated 372 U.S. 765, 83 S.Ct. 1102, 10 L.Ed.2d 136 (1963). The Court's disposition of *Vitarelli* highlights the distinction between the government's unquestioned power to remove employees and restraints which due process may nevertheless impose on how that power may be exercised.

Thirdly, *Cafeteria Workers* was based in part on the Court's perception that the employee's injury was minimal. *Id.*, 367 U.S. at 895–896, 81 S.Ct. 1743. See *Willner*, 373 U.S. at 103 n. 2, 83 S.Ct. 1175; *Bickel*, supra, at 73. There, the employee was merely barred from working at her employer's concession at one particular military installation. She did not lose her job, and she remained free to work for her employer at other locations. The Court further explicated that the ban for "security reasons" did not "bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity . . . . For all that appears, the Security Officer . . . may have simply thought that [the employee] was garrulous, or careless with her identification badge." *Id.*, 367 U.S. at 898–899, 81 S.Ct. at 1750–1751. Although the Court's estimate of the injury differed from the employee's in *Cafeteria Workers*, there can be no dispute but that the instant plaintiffs were seriously aggrieved by their dismissals. The gov-

---

11. Ex Parte Hennen, 13 Pet. 230, 10 L.Ed. 138 (1839), in effect approving the political spoils system, held that the judicial branch had the power to remove a district court clerk. The only issue was the power to remove an inferior officer without cause; there was no issue raised concerning procedural due process. Similarly, Crenshaw v. United States, 134 U.S. 99, 10 S.Ct. 431, 33 L.Ed. 825 (1890), merely upheld the power of the executive branch to decommission a Navy officer without cause when the country's need for officers diminished. Parsons v. United States, 167 U.S. 324, 17 S.Ct. 880, 42 L.Ed. 185 (1897), upheld the President's power to remove a United States Attorney prior to the expiration of his statutory term. In Keim v. United States, 177 U.S. 290, 20 S.Ct. 574, 44

L.Ed. 774 (1900), the Interior Department had dismissed a veterans preference civil service employee for inefficiency. The employee petitioned the court to review the substantive grounds of his dismissal, not any constitutional defects in process. The Court held only that federal courts would not review the executive's exercise of discretion in dismissing the employee for the indicated substantive cause. Finally, in Taylor v. Beckham, 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187 (1900), the Court held, in the context of a state election contest, that since public office was not property in the constitutional sense, the state election committee did not deprive a candidate of property when it awarded the election to his opponent.

ernment branded them as dishonest, discharged them, and permanently disqualified them from ASCS employment.

Fourthly, the government interest advanced in *Cafeteria Workers,* the maintenance of national security at a Navy ordnance factory, exceeds that advanced here, and more clearly supervenes the competing interests of the employee. See Goldberg v. Kelly, 397 U.S. at 263 n. 10, 90 S.Ct. 1011.

Fifth, *Cafeteria Workers* may be read as holding only that the employee was not entitled to a hearing prior to being barred from the installation: "But to acknowledge that there exist constitutional restraints upon state and federal governments in dealing with their employees is not to say that all such employees have a constitutional right to notice and a hearing *before* they can be removed." *Id.,* 367 U.S. at 898, 81 S.Ct. at 1750 (emphasis added). Subsequent cases appear to put this gloss on *Cafeteria Workers,* placing it in that established line of cases which hold that in certain "extraordinary situations" the government can take summary action pending a later hearing.[12] Boddie v. Connecticut, 401 U.S. at 378–379, 91 S. Ct. 780, n. 6; Goldberg v. Kelly, 397 U. S. at 263 n. 10, 264, 90 S.Ct. 1011.

Finally, the insular position of *Cafeteria Workers,* sandwiched chronologically between prior and subsequent cases which strained to avoid the constitutional due process issue, see, e. g., Greene v. McElroy, supra; Peters v. Hobby, supra; Vitarelli v. Seaton, supra; and Williams v. Zuckert, supra, enforces the impression that it is an exceptional case decided on its particular facts. See *Bickel,* supra, at 72. The Court's subsequent development of the law of procedural due process confirms this impression. See Goldberg v. Kelly, supra;

Boddie v. Connecticut, supra; Morrissey v. Brewer, supra; Board of Regents v. Roth, supra. See also Williams v. Zuckert, 371 U.S. at 533–536, 83 S.Ct. 403, 9 L.Ed.2d 486 (Douglas, J., dissenting).

We therefore conclude that in these circumstances, where untenured federal non-civil service employees are dismissed and permanently disqualified from future employment on the basis of secret charges which impugn their honesty and integrity, and where they have made timely and good faith requests to confront their nameless accusers, procedural due process requires that the government provide an opportunity to refute the charges by confronting and cross-examining such adverse witnesses, absent a specific finding that the government has "good cause" to protect its confidential informant with a cloak of absolute secrecy. See Peters v. Hobby, 349 U.S. at 350–353, 75 S.Ct. 790 (Douglas, J., concurring). As Justice Frankfurter so eloquently put it:

> The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.

Joint Anti-Fascist Refugee Committee, 341 U.S. at 170, 71 S.Ct. at 647 (concurring opinion).

IV.

Both McNeill and Canady requested an opportunity to confront and cross-examine their accusers, but the government rejected their requests. It supplied only selected excerpts from its investigative and audit reports, at best anonymous double hearsay. Even these

---

12. See, e. g., Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950).

were supplied some time after the plaintiffs' hearings before the State Committee.

 McNeill, however, admitted, with respect to the second allegation against him, that he knew that the erroneous CAP agreement had been prepared, and that he received payment pursuant to it. He denied that he caused it to be prepared. With respect to this allegation, McNeill's admission was sufficient to provide a basis for his dismissal. Thus, an opportunity to confront his accusers would have availed him nothing; he had become his own accuser. Since the ASCS could with perfect justification have discharged him for the admitted dereliction alone, we affirm McNeill's dismissal.

Canady, on the other hand, stoutly denied the allegations against her. The government's case was based on the investigative reports, which related the hearsay statements of nameless informers whom Canady could not confront or cross-examine. We cannot affirm a dismissal which took place under these circumstances, and accordingly we reverse with respect to Canady and remand for further proceedings consistent with this opinion. The district court should order her reinstatement and award her back pay with interest, except for any period that, in accordance with applicable regulations, she may have been suspended without pay awaiting a proper disposition of the charges against her. See Horton v. Orange County Board of Education, 464 F.2d 536 (4 Cir. 1972). Any award shall be reduced by any interim earnings she may have derived from other employment. Our reversal and remand are without prejudice to the right of the government to seek her discharge anew provided that it proceeds with full adherence to her right to procedural due process.

No. 72–2319 affirmed.

No. 72–2320 reversed and remanded.