In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 15-2043

JAMES E. RIANO,

*Plaintiff-Appellant,*

*v.*

ROBERT A. MCDONALD, Secretary of Veterans Affairs,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 11-cv-939 — **Charles N. Clevert, Jr.**, *Judge.*

_____

ARGUED JANUARY 11, 2016 — DECIDED AUGUST 17, 2016

_____

Before EASTERBROOK, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* James Riano worked as a registered nurse for the Veterans Health Administration, which is part of the U.S. Department of Veterans Affairs. While examining male patients for genital warts, Riano manipulated their penises with his hands, attempting to induce erections. He also used words like "pecker" and "balls," rather than

medical terms. The agency found his examination technique and his language to be inappropriate, so he was fired. He appealed and was given a hearing that included representation by counsel, live testimony from medical experts, written testimony from patients, and a written report from an investigator who had interviewed the patients. The appeals board affirmed his termination.

Riano sought review in federal district court, and now appeals to this court, arguing that the agency's procedures were constitutionally inadequate. He complains that he was not allowed to call patients to testify live. Live testimony, he argues, would have shown that some patients were comfortable with his technique and language, and also might have shown that complaining patients had ulterior motives. But the board's decision to affirm Riano's termination was based on its determination that his technique and language were inappropriate. That was a professional judgment that did not turn on the patients' subjective views. And Riano does not dispute the relevant details about his technique and language. So he has failed to show that he was harmed by the lack of live patient testimony. We affirm.

## I. BACKGROUND

### A. Allegations and Initial Termination

In the late 1970s and early 1980s, Riano was a hospital corpsman in the Navy. As a civilian, he became a registered nurse. In 2004, he began working as a registered nurse for the Veterans Health Administration at a medical center in Milwaukee. In the summer of 2007, he began working in the center's new clinic, which specialized in treating genital warts. In January 2008, a patient accused him of sexual as-

sault. According to the allegations, Riano told the patient that it was easier to see genital warts on an erect penis, and during each visit, Riano used his hands to stimulate the patient's penis until it was erect. Twice, the patient ejaculated.

Joe Cossairt, a Special Agent in the agency's Office of the Inspector General, investigated Riano. Cossairt sent questionnaires to the forty-eight patients Riano had treated, and conducted follow-up interviews with the twenty-two who responded. Cossairt concluded that Riano had manipulated patients' penises with his hands (sometimes using over-the-counter moisturizing cream), and had used inappropriate non-medical language with patients. After reviewing the report, the chief of dermatology opined that Riano's technique was not standard and not medically necessary.

In December 2009, the manager of the medical division recommended that Riano be fired because of his inappropriate language and technique. Riano responded orally and in writing, arguing that his method of causing erections to conduct examinations was appropriate and was what he had learned in the Navy. The center's associate medical director of nursing recommended Riano be fired, and the center's director agreed.

## B. Appeal Within Agency

### 1. Appeals Board's Evidentiary Rulings

Riano appealed and was given a hearing. He had learned the identities of some (but not all) of the patients who had submitted written responses to the investigator's questionnaire. Riano's lawyer contacted those patients and some were supportive of Riano, saying they were comfortable with his language and technique. Additionally, some were

critical of the investigator, saying his questions were too suggestive, he took their answers out of context, and he raised an inappropriate consideration by asking if they believed Riano was gay.

These supportive patients submitted written statements to the appeals board. Riano asked the board to let the patients testify live, and he also asked for the names of *all* patients who spoke to the investigator. The agency also asked to present live testimony from some patients. The board denied these requests, citing patient privacy, potential emotional harm, and the adequacy of the patients' written statements. The board also denied Riano's request to present testimony from a former corpsman who had trained and worked with Riano in the military—the board found this proposed testimony irrelevant.

### 2. Riano's Testimony

Riano testified that he learned his technique in the Navy, and he described his technique and its justifications in some detail. He said that he began each examination by applying moisturizing cream to the penis. He admitted that doing so was not strictly necessary, but he said that it created a sheen that made warts easier to see. The cream also combated dry skin and he applied it over the entire penis, including areas not being examined. He then "pull[ed] out" on the penis and applied pressure at the base of the penis to "entrap blood within the shaft which would provide a firmer surface." That caused the penis to become "enlarged." Riano estimated that 75–80% of his patients developed partial or full erections. That result was intended because Riano believed the firm surface—enlargement, erection, or engorgement—made warts easier to see. (Indeed, he told patients to do self-

examinations at home when they had "full erection[s].") Riano denied wrapping his hand around the penis and stroking it, denied telling patients to visualize women they wanted to have sex with, denied telling patients not to masturbate for a week prior to seeing him for an examination, and denied conducting examinations in a manner designed to result in his own personal pleasure.

Concerning his communication with patients, Riano admitted to using terms like "cock," "dick," "tool," and "balls," and also to identifying himself as a "pecker checker" and "dick doctor," but he said he only used such terms if the patient did so first. Such language, he said, can put patients at ease. He denied discussing any patient's examination with another patient and denied complimenting patients for having smooth penile skin. But he admitted saying to a patient, "you hang," referring to the size and position of the patient's flaccid penis. That comment, he said, was relevant to his advice to the patient—to cover up a blister so that it did not rub against the patient's underwear and cause irritation.

### 3. Medical Testimony

The agency presented a number of medical witnesses. William Aughenbaugh, the department's director of dermatology, testified that he had treated thousands of male patients for genital warts. He would sometimes, but not typically, gently stretch a patient's skin, and for small warts he would sometimes use magnifying lenses. But he testified that a firm surface is not necessary. He also testified that it was inappropriate to use crude language with patients, even to put patients at ease. Blaine Jensen, a certified physician's assistant, testified that he had treated about one hundred patients and that an erection—even a partial one—was not nec-

essary, nor would it make treatment easier. He also testified that crude language was inappropriate but admitted to using words like "nuts," "balls," and "dick" with younger veterans to build rapport. Judith Murphy, who was previously the medical center's associate director of nursing, testified that it was not necessary to have an enlarged surface to see genital warts and that it was unprofessional to use terms like "pecker" and "dick," even to put patients at ease.

Riano also presented medical testimony. April Bigelow, a nurse practitioner in a clinic that specializes in treating sexually transmitted diseases, testified that she had treated hundreds of patients, about half of whom became at least partially erect when their skin was manipulated. She opined that greater surface area can be beneficial, and she sometimes told patients that a self-examination might be easier with an erect penis. But she also said that an erection was not medically necessary, that she had never purposefully induced a patient's erection, and that she did not think doing so was an acceptable medical technique. She said that Riano described his technique to her as "sometimes appl[ying] pressure at the base of the penis in order to enhance surface area." In her opinion, that was "within the scope of practice for a nurse." She also said that if a patient used "crude language" to describe body parts, she would use the same language, to facilitate communication. Amber Robbins, a dermatologist, testified that she had conducted between twenty and thirty genital-wart examinations in the prior three years, and her patients rarely developed erections. She said that purposefully causing an erection was not a method that she would use, nor was it necessary.

Jeanine Harvey also testified in defense of Riano. Harvey was one of the center's health technicians and, like Riano, had been a Navy corpsman. Her description of a corpsman's training and experience matched Riano's. Harvey knew many military providers, herself included, who applied pressure to the base of a penis to induce firmness when examining for genital warts or other conditions. She opined that doing so was necessary. She had seen frequent erections, and four ejaculations, during examinations. She also testified that it was common to use moisturizing cream to create a sheen that makes warts easier to see.

### 4. Appeals Board's Conclusion and Judicial Review

The appeals board found that Riano failed to distinguish between language and practices suitable for a corpsman and those suitable for a registered nurse. The board recognized that not all patients subjectively felt that they had been assaulted or that Riano's communication with them had been inappropriate. But the board found that, objectively, Riano had used language and an examination technique that was medically inappropriate. So the board affirmed Riano's termination. He sought review in the district court, which affirmed, and he now appeals to this court.

## II. ANALYSIS

The agency brought two "charges" against Riano: (i) inappropriate manual manipulation of male veterans' genitals; and (ii) unprofessional comments to veterans during examination or treatment. Each charge was made up of numerous "specifications," which are individual instances of alleged misconduct. To sustain a charge, the agency was only re-

quired to prove one specification, and only so much of that specification as necessary to sustain the essence of the charge. *See Burroughs v. Dep't of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990); *Avant v. Dep't of Air Force*, 71 M.S.P.R. 192, 198 (1996).

Riano had a statutory right to appeal his termination, first within the agency and then to federal court. 38 U.S.C. §§ 7401(1), 7461(a), 7462(f)(1). In court, he complains about alleged defects in the agency's procedures, so we must set aside the agency's decision if it was "obtained without procedures required by law." 38 U.S.C. § 7462(f)(2)(B). The "law" that Riano relies on is the federal constitution and as a "public employee" who had "a property interest in [his] job," the constitution protects him from being fired without "due process of law." *Carmody v. Bd. of Trs. of the Univ. of Ill.*, 747 F.3d 470, 474 (7th Cir. 2014) (citing cases). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

We have said that "the due process clause is flexible and requires only 'such procedural protections as the particular situation demands.'" *Ringquist v. Hampton*, 582 F.2d 1138, 1140 (7th Cir. 1978) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). To determine whether an agency's procedures failed to meet the constitutional minimum, courts balance three factors: "first, the private interest that was affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including

the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013) (internal quotation marks and brackets omitted) (quoting *Mathews*, 424 U.S. at 335). Riano complains about the appeals board's refusal to hear live patient testimony. Riano wanted to present live testimony from supportive patients, and wanted to cross-examine complaining patients. Riano argues that the balancing analysis prescribed by *Mathews* demonstrates that live testimony and cross-examination were constitutionally required.

But a balancing analysis is not required if Riano cannot explain how live testimony and cross-examination would have helped his case. *See Clancy v. Geithner*, 559 F.3d 595, 601 (7th Cir. 2009) (lack of hearing did not violate due process where plaintiff did "not identify any material factual disputes that could have been resolved by an evidentiary hearing or cross-examination of witnesses"); *Wozniak v. Conry*, 236 F.3d 888, 890 (7th Cir. 2001) ("[E]ven for the most important decisions, an evidentiary hearing is required only if there are material factual disputes."); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544 (1985) (noting that the employees' terminations involved "arguable issues" and that their due-process argument did not require them to show "certain success"). That rule is well illustrated by *Ringquist v. Hampton*, 582 F.2d 1138 (7th Cir. 1978). Ringquist was fired from his job as an auditor for the IRS. The reason was that on audits related to seventeen tax returns, Ringquist had marked certain deductions as "verified" even though the taxpayers lacked verifying documentation. Ringquist's defense was that although the taxpayers lacked documentation, Ringquist had, with an innocent state of mind, relied on

representations made to him by the taxpayers' tax preparer. Ringquist's termination was upheld after a hearing at which affidavits were received from the seventeen taxpayers but the taxpayers did not testify live and were not available for cross-examination. In federal court, Ringquist argued that due process required an opportunity to cross-examine the taxpayers. We rejected that argument because Ringquist's theory of defense—that he had innocently relied on the tax preparer, and that the deductions were, in a technical sense, "verified"—would not have been advanced by cross-examining the taxpayers. *Id*. at 1141.

Riano's case is similar. The appeals board issued a written opinion explaining its determination that Riano's language and examination technique were medically inappropriate. That decision was not dependent on the subjective feelings of Riano's patients. Notably, several patients said—in written statements or in their interviews with the investigator—that Riano had manipulated their penises, but not in a way that made them uncomfortable. A typical statement was that Riano "never continued to 'stroke' or manipulate my penis beyond what was necessary for him to treat me or find the warts." But what is "necessary" in a genital-wart examination is a medical question, and the board heard testimony that: (i) Riano's technique was *not* necessary; and (ii) patients tend to trust what their medical provider tells them about what is "necessary." So, though the board acknowledged the patients' statements, it did not find that they supported overturning Riano's termination.

Nor was the board's decision based on *Riano's* subjective intentions.[1] In arguing that his intentions were innocent, Riano stressed that he learned his examination technique in the Navy, where he also learned to use slang to put patients at ease. The record shows that the board found those factual contentions irrelevant. The board denied Riano's request to call as a witness a "former corpsman who was trained with and worked in the same military clinics" as Riano. The board considered the corpsman's proposed testimony irrelevant, noting that "corpsman training is not equivalent to [registered nurse]." The board credited Riano's testimony about his training but found it "significant" that he was unable "to distinguish his training and actions as a corpsman (with no professional licensure or training) from that of the professional licensed registered nurse." The board specifically found that Riano's "training as a Navy corpsman in the treatment of genital warts and the acceptance of the use of crude slang terms, is not [an] excuse for this behavior to have continued after he received training as a Registered Nurse and in his practice as a nurse in the Department of Veterans Affairs Medical Center."

Because the board did not rely on the subjective feelings of patients, or the subjective intentions of Riano, Riano does not state a due-process violation by arguing that live patient testimony and cross-examination would have been relevant to those issues. In *Green v. Board of School Commissioners*, 716 F.2d 1191 (7th Cir. 1983), a school bus driver was fired for making "suggestive, lewd, and/or sexual advances" to girls

---

[1] To be sure, the agency's lawyer asked Riano questions that were aimed at his subjective intentions. But we review the board's decision, not the lawyer's examination.

on his bus. His argument that he was denied due process because he could not cross-examine the girls was rejected, in part because he admitted to the relevant conduct and disputed only the irrelevant issue of his state of mind. *Id*. at 1193 ("Green concedes that he often 'clowned around' with girls on his bus. Maybe Green's intentions when he touched these girls were not as bad as the girls believed. That, however, is beside the point. Green was charged with having made 'suggestive, lewd, and/or sexual advances,' not with attempted rape."). In *McNeill v. Butz*, 480 F.2d 314 (4th Cir. 1973), a male named McNeill and a female named Canaday were both fired from the Department of Agriculture for alleged wrongdoing. They were given hearings but not allowed to cross-examine their accusers. The court found that under the particular circumstances, cross-examination was constitutionally required. *Id*. at 325. The court reversed Canaday's termination. *Id*. at 326. But it affirmed McNeill's because, though he denied some of the allegations against him, he admitted enough of them to justify his termination. *Id*.

Riano is like Green in *Green* and McNeill in *McNeill* (and not like Canaday in *McNeill*). That is, the appeals board justifiably affirmed his termination based on facts that he admitted. To the extent he disputed very specific details—such as whether he wrapped his hand around the penis—resolving those disputes was not necessary to the board's decision. In short, we agree with the reasoning and conclusion of the district court:

> Here, Riano is like the male employee in *McNeill*. His own testimony provided confirmation or corroboration of his treatment technique. Regardless of whether the veteran pa-

tients were accurate as to lengthy stroking of their penises and whether Riano manipulated them to a partial or full erection, Riano's own testimony confirmed that he pressed on the veteran patients' penises to increase blood flow and firmness. And he admitted using corpsman language with patients. Hence, Riano fails to persuade this court that confrontation and examination of the veteran witnesses would have altered the hearing result in any way.

### III. CONCLUSION

The decision of the district court is AFFIRMED.