756 F.2d 1032
 Thomas G. BECKHAM, Appellee,
v.
J. Gordon HARRIS, in his official capacity as Chief of
Police of the Horry County Police Department, and
individually; George O. "Buddy" Fowler, in his official
capacity as Captain of Detectives of the Horry County Police
Department, and individually; Horace Jordan; Winfred Gore;
Elton Johnson; Bobby Johnson; J.D. Flowers; Delano
Sanders; Joshua Vaught, Worth Lee; A.B. Grainger; Bill
Ward, and Harold Rogers, in their official capacities as
Horry County Police Commission Members, and individually;
and The Horry County Police Commission; William J. Brown,
in his official capacity as former County Administrator for
Horry County, and individually; and John Hatchell, in his
official capacity as County Administrator, and individually;
Bob Childs; W.G. Hucks, Jr.; Ulysses Dewitt; Peggy G.
Lewis; Greg Smith; Robert Gary Steele; Johnny M.
Singleton; James R. Frazier; Bill Shannon; Robert Lee
Rayburn; Arthur M. Marlowe, and Rogers L. Hammond, in their
official capacities as former members of the Horry County
Council; and Laurie McLeod; Ulysses Dewitt; Robert Edge,
Jr.; Rev. J. Leroy Weathers; Dewey Kirkley; Robert G.
Steele; Alton Duncan; James R. Frazier; Paul Creel; W.
Paul Prince; Brice Blanton; and W.G. Hucks, Jr., in their
official capacities as members of the Horry County Council
and individually; and Horry County Council; James O. Dunn,
in his official capacity as Solicitor for Horry County, and
individually, Appellants.
Thomas G. BECKHAM, Appellant,
v.
William J. BROWN, in his official capacity as former County
Administrator for Horry County, and individually; and Bob
Childs, W.G. Hucks, Jr., Ulysses Dewitt, Peggy G. Lewis,
Greg Smith, Robert Gary Steele, Johnny M. Singleton, James
R. Frazier, Bill Shannon, Robert Lee Rayburn, Arthur M.
Marlowe, and Roger L. Hammond, in their official capacities
as former members of the Horry County Council, and
individually, Appellees,
and
J. Gordon Harris, in his official capacity as Chief of
Police of the Horry County Police Department, and
individually; George O. "Buddy" Fowler, in his official
capacity as Captain of Detectives of the Horry County Police
Department, and individually; Horace Jordan; Winfred Gore;
Elton Johnson; Bobby Johnson; J.D. Flowers; Delano
Sanders; Joshua Vaught; Worth Lee; A.B. Grainger; Bill
Ward, and Harold Rogers, in their official capacities as
Horry County Police Commission Members, and individually;
and The Horry County Police Commission; John Hatchell, in
his official capacity as County Administrator, and
individually; Laurie McLeod; Ulysses Dewitt; Robert Edge,
Jr.; Rev. J. Leroy Weathers; Dewey Kirkley; Robert G.
Steele; Alton Duncan; James R. Frazier; Paul Creel; W.
Paul Prince; Brice Blanton; and W.G. Hucks, Jr., in their
official capacities as members of the Horry County Council
and individually; and Horry County Council; James O. Dunn,
in his official capacity as Solicitor for Horry County, and
individually, Defendants.
 Nos. 84-1211(L), 84-1261.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 29, 1984.
Decided March 13, 1985.
 
 Harold W. Jacobs, Columbia, S.C. (Nexsen, Pruet, Jacobs & Pollard, Columbia, S.C. John P. Henry; Thompson, Henry & Guinn, P.A., Conway, S.C., on brief), for appellants.
 John M. Leiter (Lawn & Leiter; Myrtle Beach, Kenneth A. Richstad, Childress & Richstad, Columbia, S.C., on brief), for appellee.
 Before HALL and MURNAGHAN, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The present appeal arises from an action brought by Thomas G. Beckham ("Beckham"), a former narcotics detective with the Horry County South Carolina Police Department ("the police department") who was discharged by the defendant, Chief J. Gordon Harris ("Harris"),[1] on February 28, 1981 after submitting false information in an incident report and in an affidavit used to procure search and arrest warrants. Beckham asserts that he was discharged without a pre-termination hearing in violation of his right to procedural due process secured by the fourteenth amendment to the United States Constitution.
 
 
 2
 The case was tried to a jury from November 28, 1983 to December 2, 1983 and on December 8, 1983 judgment was entered awarding Beckham $20,000 in actual and $5,000 in punitive damages for violation of his property interest and $15,000 actual and $10,000 punitive damages for injury to his liberty interest in his continued employment with the police department. The defendants Harris, Dunn, and the former Police Commission members made a motion for a directed verdict at the close of plaintiff's case and a post verdict motion for judgment n.o.v. or, in the alternative, for a new trial. Those motions were denied by the district court as to those defendants. Harris, Dunn, and the Police Commission members timely appealed.
 
 I.
 
 3
 Beckham was hired by the police department as a patrolman in July of 1979. Satisfactory execution of his duties was presumably the reason for his promotion and reassignment two years later to the position of detective in the Narcotics Division. In his new assignment Beckham served as an undercover narcotics officer with another detective, Mike Foreman.
 
 
 4
 The events which ultimately led to Beckham's discharge took place on January 20-21, 1981. Beckham and Foreman were assigned to investigate reports that illegal drugs were being stored at the Ship's Wheel Seafood Restaurant in North Myrtle Beach, South Carolina. They commenced a "stake-out" of the restaurant on the night of January 20, 1981. On the morning of January 21, 1981, after an uneventful night's surveillance, Foreman left the scene to procure a search warrant. Beckham remained at the scene and stationed himself in a wooded area behind the restaurant. Upon Foreman's return, the officers executed the search warrant and discovered a large amount of marijuana[2] stored in the restaurant's walk-in freezer. The duo requested a back-up and as other officers arrived Foreman began to relate a completely fictitious story. Foreman claimed that, when he returned with the search warrant, he saw a silver van pull into the restaurant's parking lot followed by a black pick-up truck. Foreman claimed he recognized the driver of the van as Jerry High and mentioned that three other subjects, whom he identified only as Cuban nationals, occupied the van as well. The suspects, upon discovery of the officers, supposedly fled the scene at a high rate of speed. Although Beckham was not stationed in the parking lot when the silver van allegedly entered the lot he did not believe his partner's story. Beckham questioned Foreman about his fictitious account and Foreman told him that it was an attempt to "smoke-out" fellow police officers who he believed might be involved in illegal drug smuggling. Foreman told Beckham to go along with the story; Beckham acquiesced.
 
 
 5
 Later that same day, based upon an informant's tip, police officers were told that three Hispanic men were seen at a local motel and that these persons had participated in the loading or unloading of the marijuana at the Ship's Wheel Restaurant. Upon the officers' arrival at the motel, several individuals of alleged Cuban nationality fled the motel on foot. Later that same day, within a five block area of the motel, Jerry High was observed by police officers in a silver van along with three Hispanic males, all of whom were stopped and taken into custody. The van was transported to the Horry County jail to be searched.
 
 
 6
 In his affidavit, to be used as a basis for obtaining a warrant to search the seized van, Beckham attested to the fictitious story that Jerry High had been seen at the Ship's Wheel Restaurant on the morning of January 21, 1981.[3] Beckham's affidavit also served as a basis for arrest warrants issued for Jerry High, Bobby Gore and three male Hispanics of Cuban nationality.[4] An incident report was also prepared by Beckham and Foreman containing the fictitious information.
 
 
 7
 A preliminary hearing was held on February 26, 1981 in relation to the arrests of High, Gore and the Cuban nationals. Foreman advised Beckham a few minutes before the hearing that he was going to stick with the fabricated story contained in the affidavit and in the incident report. At this point Beckham refused to present perjured testimony. He advised Captain George "Buddy" Fowler, his supervisor, and James O. Dunn, the county solicitor, that the information contained in the affidavit and incident report was false. He also admitted destroying a statement by another police officer which made reference to a set of keys found at the county jail. Beckham did not testify at the preliminary hearing. On February 28, 1981 Beckham was discharged from the Horry County Police Department for furnishing false information. Foreman was discharged for testifying falsely at the preliminary hearing. Beckham did not request a hearing to challenge the charges against him. On March 12, 1981, Beckham was indicted by the State of South Carolina on charges of false swearing, conspiracy and obstruction of justice. He was later tried and acquitted of those charges.
 
 
 8
 Dunn and Chief of Police Harris called a press conference after the terminations. A press release was issued on February 28, 1981 announcing that both Beckham and Foreman had been discharged and several articles subsequently appeared in a local newspaper detailing the circumstances surrounding the officers' discharge and the dismissal of drug charges against the five previously arrested men.
 
 II.
 A.
 
 9
 Harris initially contends that detective Beckham had no constitutionally protected property interest in his continued employment with the police department. Therefore, the department was not constitutionally obligated to provide Beckham with an opportunity to rebut the charges against him prior to his termination from the police force.
 
 
 10
 In order to be entitled to the procedural safeguards encompassed by the due process clause of the fourteenth amendment (notice and an opportunity to be heard) the complaining party must suffer from deprivation of a liberty or property interest. Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1971). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.... He must have a legitimate claim of entitlement to it." Id. at 577, 92 S.Ct. at 2709. The sufficiency of such a legitimate claim of entitlement must be decided by reference to state law, Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) as evidenced by state statutes, local ordinances, rules or mutually explicit understandings that support the claim. Perry v. Sinderman, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Only when such a property interest exists does a constitutional right to a hearing attach. Roth, supra, 408 U.S. at 577, 92 S.Ct. at 2709. Our present inquiry, therefore, must be whether any South Carolina authority supports Beckham's claim that he has a property interest in his continued employment with the police department.
 
 
 11
 By Act of 1959, 1959 S.C. Acts & Joint Resolutions 18 ("1959 Act"), the General Assembly of the State of South Carolina created the Horry County Police Commission.[5] Section two[6] describes the powers and duties of the commission, police chief and policemen. It also provides that county policemen serve "at the pleasure of the commission." On March 7, 1977, the Horry County Police Commission adopted the "Horry County Police Department Personnel Policies" ("personnel manual"), a manual governing the rules of conduct for county policemen. The manual, in its introduction, contains language identical to that employed in section 2 of the 1959 Act Beckham asserts that the 1959 Act and the personnel manual establish that an employee may only be terminated "for cause" and therefore that a property interest exists in his continued employment.[7] Moreover, he contends that the explicit language of the 1959 Act and personnel manual requires a pre-termination hearing. We are unpersuaded, however, that either document establishes a property interest in Beckham's employment with the police department or mandates a pre-termination hearing in an instance where none is requested.
 
 
 12
 The 1959 Act and personnel manual both clearly state that terms of employment are "at the pleasure of the commission."[8] We have previously construed identical language to mean that an employee who serves without an employment contract is at the will of the employer and subsequently has no tenure and therefore no property interest in his employment, Patterson v. Ramsey, 552 F.2d 117, 118 (4th Cir.1977), unless the discharge is in violation of procedural rules adopted by the employer specifically designed to protect employees from immediate discharge. Prince v. Bridges, 537 F.2d 1269, 1272 (4th Cir.1976). Such procedural rules for employee discharge can be found in the "State of South Carolina, County of Horry Employee's Personnel Policies" ("Employee's Personnel Policies manual"),[9] although Beckham suggests in his amended complaint that the manual may not apply to police officers. Beckham, however, failed to request a pre-termination hearing within the prescribed thirty day period; he waited until May 18, 1981, over two months after his discharge, before requesting a hearing.[10] The Employee's Personnel Policies manual provides for a pre-termination hearing to those aggrieved employees who request one. The police department is not required, either by constitutional or statutory mandate, to provide a hearing to one who sleeps on his rights. Since no state constitutional,[11] statutory or contractual basis exists supporting Beckham's property interest claim we must conclude that no such expectation arises.
 
 B.
 
 13
 Appellant next argues that Beckham had no constitutionally protected liberty interest in his employment because Beckham acted as his own accuser, thereby negating the need for a due process hearing. We agree.
 
 
 14
 There is little doubt that a constitutionally recognized liberty interest is implicated and the right to procedural due process required when government action threatens an employee's good name, reputation, honor or integrity. Roth, supra, 408 U.S. at 573, 92 S.Ct. at 2707. Moreover, governmental dismissal may abridge liberty if an employee is foreclosed from taking advantage of future employment opportunities. Id. at 574, 92 S.Ct. at 2707. In such a case, due process requires that the aggrieved individual be afforded a hearing to clear his good name. Beckham finds an infringement upon a protected liberty interest arising from the publicity surrounding his termination. He asserts that false information was spread by the defendants severely damaging his reputation and good name.[12] The truth or falsity of Beckham's claim, however, has little import in an action alleging infringement of a constitutionally protected liberty interest. Bishop v. Wood, supra, 426 U.S. at 349, 96 S.Ct. at 2079. Such an assertion is more properly addressed in a state court defamation proceeding.[13] While there may well have been publicity tending to disparage Beckham's character, we have previously held that the need for a pre-termination due process hearing is negated where the discharged employee has admitted his guilt and, in essence, become his own accuser. McNeill v. Butz, 480 F.2d 314, 320 (4th Cir.1973). An opportunity to confront his accusers or present exculpatory evidence serves no useful purpose when the accused himself has admitted the very acts which compromise his character or impugn his integrity. There exists ample, uncontested support in the record that Beckham admitted falsifying the affidavit and incident report.[14] While twenty-twenty hindsight counsels Beckham against engaging in such regrettable conduct in the future, a liberty interest protectable by the due process clause of the fourteenth amendment does not arise in this case where Beckham by his own words and deeds admitted misconduct. A hearing, had it been granted, would only have confirmed the accuracy of the press release. That a newspaper got things wrong in a manner injurious to Beckham creates no cause of action against the defendants when, as here, no persuasive showing has been made that they contributed to the media error.
 
 
 15
 Accordingly, we reverse, and direct that judgment n.o.v. be entered in favor of Harris, Dunn and the former Police Commission members.
 
 
 16
 REVERSED.
 
 
 
 [1]
 Also named as defendants were George O. "Buddy" Fowler, Captain of Detectives, J.D. Flowers, Winfred Gore, A.B. Grainger, Bobby Johnson, Elton Johnson, Horace Jordon, Worth Lee, Delano Sanders, Harold Rogers, Joshua Vaught, Bill Ward, in their official capacities as Horry County Police Commission members; James O. Dunn, Solicitor of the 15th Judicial Circuit, all members of the Horry County Council at the time of Beckham's discharge, John Hatchell, County Administrator and William J. Brown, former County Administrator. Beckham ultimately recovered only against defendants Harris, Jordan, Gore, E. Johnson, B. Johnson, Flowers, Vaught, Lee, Grainger, Ward and Rogers, members of the Horry County Police Commission and James O. Dunn, the County Solicitor. Beckham filed a cross appeal challenging the district court's granting of judgment n.o.v. as to defendant Brown and members of the Horry County Council. We find, however, that judgment n.o.v. was properly granted as to those defendants
 
 
 [2]
 In his affidavit executed subsequent to the seizure, Beckham reported that 50 bales or approximately 3,000 pounds of marijuana were confiscated
 
 
 [3]
 The affidavit stated in pertinent part, that "Officer Mike Foreman did on the morning of January 21, 1981 observe Jerry High at the Ship's Wheel Seafood House driving a silver Dodge van. Upon discovering police officers on the scene, Jerry High fled the area in the said van at a high rate of speed.... Less than one hour elapsed between the time Jerry High was observed fleeing the Ship's Wheel Seafood House and the time his vehicle was stopped along with (3) three other occupants of the said van...."
 
 
 [4]
 All drug charges were subsequently dismissed against High, Gore and the three Cuban nationals
 
 
 [5]
 The Horry County Police Commission was subsequently abolished by county ordinance on April 16, 1981
 
 
 [6]
 SECTION 2. Powers and duties of commission--duties of chief and policemen.--... The terms of the county police, including the chief, shall be at the pleasure of the commission and the commission shall have the exclusive power to remove any county policeman, including the chief, but such policeman shall first be allowed a hearing before the commission prior to his removal; provided, however, that such county policeman may be suspended by the commission pending such hearing
 
 
 [7]
 At trial Beckham testified that it was his understanding that he could only be fired "for cause" once he attained permanent employee status. He also asserts that the disciplinary guidelines found in the personnel manual create an expectation that an employee cannot be discharged except for violation of certain specified conduct. This evidence, however, does not establish that a property interest was created in Beckham's continued employment with the police department. Moreover, the very guidelines to which Beckham points mandate his immediate discharge, i.e., "Group C--First Violation may result in discharge: 1. Falsification of records or misrepresentation of material information."
 
 
 [8]
 While the personnel manual and the 1959 Act go on to state that an employee "shall" be allowed a hearing, the mere use of the word "shall" does not change the essential character of the employment relationship into something other than one at will. "Shall be allowed a hearing" is not the same as "shall be heard, whether or not a request for a hearing has been made."
 
 
 [9]
 The Employee's Personnel Policies manual is a plan adopted in accordance with Sec. 8-17-120 of the County and Municipal Employees Grievance Procedure Act ("the Act"). S.C.Code Sec. 8-17-110 (1976), a state statute which sets forth "a uniform procedure to resolve grievances of county and municipal employees arising from their public employment." Sec. 8-17-110. On August 10, 1976, the Horry County Board of Commissioners approved the Employee's Personnel Policies Manual "for Horry County employees," which presumably would include Horry County police officers. Several letters by Chief Harris and other county officials presented in the record before us find the Employee's Personnel Policies Manual applicable to police officers. If perchance Horry County "procedural safeguards" do not apply to police officers, such as Beckham, then as an employee serving at the will of the police commission, without a property interest in his continued employment, Beckham was not constitutionally entitled to a pre-termination due process hearing. Assuming its applicability, the grievance procedure section of the manual enumerates a three-step procedure to be followed by an aggrieved employee who cannot resolve his grievance through informal arbitration and seeks a hearing before the Horry County Grievance Committee
 In Bunting v. City of Columbia, 639 F.2d 1090 (4th Cir.1981), we held that a police officer who serves at the will of the City of Columbia has no property or liberty interest in his continued employment. The employee was nonetheless entitled to a grievance hearing under the County and Municipal Employees Grievance Procedure Act. In that case, however, the City of Columbia's personnel policy manual did not conform substantially to the Act, as required by S.C.Code Sec. 8-17-120, and policemen who filed a cognizable grievance under the department's personnel manual had to be employed by the police department for a longer period of time before being able to file a grievance than was required by the Act. No such disparity arises with the Employee's Personnel Policies manual. Nor does the Act limit the police department's ability to discharge an at-will employee. Rhodes v. Smith, 273 S.C. 13, 15, 254 S.E.2d 49, 50 (1979) (South Carolina statute allowing sheriff to dismiss deputy sheriff at his pleasure unaffected by County and Municipal Employee's Grievance Procedure Act, S.C.Code Sec. 8-17-110 (1976)).
 
 
 [10]
 The Employee's Personnel Policies Manual provides in Article IV ("Procedure"), Step I that "he may notify his department head, within 30 working days of learning of the grievable action, that he wishes to present a formal grievance. The department head, without delay, shall schedule a hearing with the employee ...."
 
 
 [11]
 Article I Sec. 22 of the South Carolina State Constitution provides:
 No person shall be finally bound by a judicial or a quasi-judicial decision of an administrative agency affecting private rights except on due notice and an opportunity to be heard; ... nor shall he be deprived of liberty or property unless by a mode of procedure prescribed by the General Assembly, and he shall have in all such instances the right to judicial review.
 Such provision, however, does not create a protectable property right, but merely protects one already in existence. Bunting v. City of Columbia, 639 F.2d 1090, 1094 (4th Cir.1981).
 
 
 [12]
 As previously stated, a press conference was held by Chief Harris and Solicitor Dunn after Beckham and Foreman were discharged. A press release issued by Chief Harris on February 28, 1981 stated that "Foreman testified falsely at a preliminary hearing and Detective Beckham was an active participant in furnishing false information to this department." A newspaper article appearing in a local newspaper, however, erroneously claimed that both Beckham and Foreman presented perjured testimony at the preliminary hearing. There has been no persuasive showing that the error of the newspaper was in any way chargeable to Harris or the other defendants
 
 
 [13]
 In fact, it was revealed during oral argument that Beckham prevailed in a state court libel action against the local newspaper
 
 
 [14]
 In a statement on February 28, 1981 to Glen B. Causey of the Horry County Police Department Beckham stated:
 Q. Tom, in the affidavit of the arrest warrant or the search warrant, was there anything in that that mentioned about them being at the restaurant when you went up to the restaurant?
 A. In the affidavit it reads in there that Mike Foreman had observed Jerry High in a van with some Cuban individuals at the scene.
 Q. And that was not true, is that correct?
 A. No sir, it was not true.
 Q. Did you sign the affidavit?
 A. I signed the affidavit. Mike said he wanted me to go ahead and get the warrants up.
 Q. But at the time that you signed the affidavit, did you know that was a false affidavit?
 A. Yes, sir, I did.
 Q. But you signed it anyhow?
 A. Yes, sir, I did.
 On March 4, 1981, Beckham was interviewed by Tom Fraser of the South Carolina Law Enforcement Division wherein he stated:
 Q. But you did sign all the affidavits and the arrest warrants?
 A. I signed all of them.
 Q. And the search warrant for the truck?
 A. Yes, sir.
 Q. But you did this at whose direction?
 A. Well, I did it at Mike Foreman's direction because he told me that he had this plan.
 Q. And as a result of you signing these warrants, the subjects were placed in the Horry County Jail?
 A. They were already in the Horry County Jail when I signed the warrants.
 Q. And since that time, they have been released on bond, is that correct?
 A. Yes, sir.
 Q. The affidavits that were signed were fabricated?
 A. Yes, sir.
 At the trial before the Honorable C. Weston Houck on November 28 and December 1 and 2, 1983 Beckham testified:
 Q. Did you tell them (referring to Lt. Causey interview) it was false?
 A. I did, yes, sir.
 Q. And you swore that that was true?
 A. Yes, sir, I did.
 Q. "At the time you signed the affidavit, did you know it was false?"
 "Yes, sir, I did."
 "But you signed it anyway?"
 "Yes, sir, I did."
 [reading from transcript of interview]
 And you raised your hand to swear it was true?
 A. I didn't raise my hand to any of this, but yes, I swore it was true.
 Q. Did you have to raise your hand to swear it was true?
 A. No, sir, I put my signature on it.
 Q. When you put your signature on it, that meant it was true?
 A. Yes, sir.
 ....
 Q. I didn't ask you about Judge Johnson. I asked you is that statement a lie?
 A. No, sir, it's not a lie. It was overlooked.
 Q. Well, is it true? It was put in there.
 A. It was intended to be true when it was put in here.
 Q. But it's not true?
 A. No, sir, it's not.
 Q. And you signed your name to it?
 A. Yes, sir, I did.