Charles ERSKINE

v.

BOARD OF EDUCATION, et al.

No. CIV.A. DKC 2000–2552.

United States District Court,
D. Maryland.

April 22, 2002.

Mary Ann Ryan, Laurel, MD, for Plaintiff.

Sheldon L. Gnatt, Knight, Manzi, Nussgaum and LaPlaca, PA, for Defendants.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this employment discrimination and civil rights case is Defendants' motion for summary judgment. The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For reasons that follow, the court shall grant Defendants' motion.

## I. Background

The following facts are uncontroverted or in the light most favorable to Plaintiff.

Charles Erskine, a white male, had been employed as a teacher by the Prince George's County Board of Education for 26 years at the time of the incidents giving rise to this case. He held a B.S. degree, a masters' degree in special education, and an advanced professional certification as a teacher. Paper no. 15, Ex. A. In April 1997, Erskine was teaching Foreign Language Exploration ("FLEX") at James Madison Middle School ("Madison") in Upper Marlboro, Maryland. Part of the FLEX program consisted of teaching conversational Spanish, Japanese, and French to the students through the use of lesson plans approved by Prince George's County Schools. Paper no. 15, Ex. C, D.

In an April 15, 1997, letter, the principal of Madison, Paul Lewis, received a complaint about Erskine from Loretta Bethea, the parent of a student in Erskine's class. In that letter, Bethea alleged that Erskine had told her daughter's class that they would never amount to anything, and that they would never get good jobs, and she alleged that Erskine refers to the students as "niggas" in class. Paper no. 14, Ex. 1, attachment 1.

Erskine was called to meet with Lewis and his vice-principal on that same day. Paper no. 15, Ex. C. Erskine was advised of the complaint and told not to do anything that could be construed as degrading or racially insensitive. Further, he was told that an investigation would ensue. *Id.*, Ex. E. Lewis testified in his deposition that he had several complaints from parents involving Erskine and had verbally counseled Erskine about his behavior. Paper no. 14, Ex. 1, attachment 2. However, he could not recall specific examples of such counseling and produced no record of

it. Paper no. 15, at 6, Ex. B. Erskine can only recall being counseled by Lewis on two occasions a number of years before the incident. *Id.*, at 7, Ex. C.

Later that week, on April 18, 1997, Lewis heard an allegation from one or more students that Erskine had written the word "nigger" on the blackboard of his classroom. In response to this allegation, Erskine was called to meet with Lewis and Susan DePlatchett, Chief Educational Administrator of the Frederick Douglass cluster of schools, which included Madison. He denied ever using the word "nigger" in the classroom. Paper no. 15, at 3. Erskine explained to them that, in the course of a class exercise, he had written on the board the names of colors in Spanish and their English translations. Erskine, apparently, had written on the board the Spanish word for black, "negro." Paper no. 15, at 3, Ex. C. DePlatchett made an "executive decision" and pulled Erskine from his classroom, assigning him to administrative duties. Lewis requested that a school security guard investigate the alleged use of the word "nigger" and Deplatchett assigned a school investigator, Mable Nelson, to prepare a report to determine whether Erskine had used the word. *Id.*, Ex. B, G.

On April 29, 1997, Erskine was called into a meeting with Dr. Sterling Marshall, Chief Divisional Administrator for Personnel, and school administrators, including the other individual defendants. Defendants describe this meeting as a due process conference. Paper no. 14, at 4. At this meeting, the administrators told Erskine that they had some concerns about his classroom statements and asked him to explain. Erskine explained that he was teaching Spanish colors and that he did not use derogatory language or make statements to students that might affect their self-esteem. Paper no. 15, at 4, Ex. C. Erskine also stated that he had been

told by Nelson that the complaints against him were determined to be unfounded by her report. *Id.* During the course of this meeting, in addition to the alleged blackboard incident, the discussion included other complaints from students and parents regarding Erskine's methods and motivations. Paper no. 14, Ex. 2; Paper no. 15, Ex. C, at 69–70. At this meeting, Erskine was not charged with any misconduct or shown any evidence, witness statements, or Nelson's report. Erskine claims that he was not given the opportunity at this meeting to ask questions or rebut evidence and that, as he understood it, any evidence supported his version of the events. Erskine was told only that the matter was being investigated and that he would be advised of the results of the investigation. Paper no. 15, at 5, Ex. C.

Prior to the meeting, Erskine had been placed on temporary assignment with pay away from a classroom. Paper no. 14, Ex. 1, 2. Effective May 13, 1997, after the meeting with administrators, Erskine was returned to classroom duties, temporarily reassigned for the remainder of the school year to Frederick Douglass High School, where DePlatchett was principal. *Id.*, at 5, Ex. J. Erskine describes his position as that of a substitute and contends that he was required to report to work early each day to receive his class assignment and was not assigned to teach in areas of his certification. *Id.*, Ex. C. Substitutes in Prince George's County schools do not require the same degrees or certification as a permanent teacher. Paper no. 15, at 6, Ex. G. There is no allegation that Erskine suffered any loss in pay.

Erskine scheduled a meeting with DePlatchett to find out the status of the investigation. DePlatchett refused to discuss the investigation with Erskine and told him, "I know you did it." *Id.*, Ex. C, at 112. Erskine became increasingly de-

spondent, had trouble sleeping, withdrew from his friends and family and was unable to work. Paper no. 15, at 6. At the end of the year, Erskine received an unsatisfactory evaluation from Lewis. This evaluation was based on complaints received about Erskine rather than personal observations by Lewis of Erskine's work in the classroom. Paper no. 15, at 6, Ex. B.

Prior to the opening of the 1997–1998 school year, Erskine reported to Frederick Douglass High School to receive his teaching assignment. Lewis spotted him in the auditorium and led him out of the building, causing him to feel stigmatized and humiliated. Paper no. 15, at 6, Ex. C. Shortly afterwards, he was advised that he would be assigned as a permanent substitute. *Id.,* at 6, Ex. G. The official notification to Erskine indicates that he continued to be assigned as a teacher with no change in pay. Paper no. 14, at 7, Ex. B. Erskine suffered a breakdown and severe depression and was unable to return to work until the 2000–2001 school year. Paper no. 15, at 6, Ex. K. Upon his return, apparently Erskine was reassigned to a classroom position. Paper no. 15, at 7.

Plaintiff brings three counts against Defendants. In Count I, brought under 42 U.S.C. § 1983, Erskine alleges that his reassignment was an adverse employment action taken against him by Defendants in retaliation for his exercise of free speech protected by the First Amendment. In Count II, brought under 42 U.S.C. §§ 2000e–3 *et seq.* ("Title VII"), Erskine alleges that Defendants illegally discriminated against him by disciplining him for the use of racially offensive language while black teachers using the same language have not been disciplined. Finally, in Count III, also under § 1983, Erskine alleges that adverse job actions taken by Defendants deprived him of his property interest in his teaching position without due process of law in violation of the Fourteenth Amendment. For reasons that follow, summary judgment will be granted as to all counts.

## II.   Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Pulliam Inv. Co.,* 810 F.2d at 1282 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct.

2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

In *Celotex Corp.,* the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 632 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. Analysis

### A. Count I: First Amendment

Erskine claims that Defendants violated his rights under the First Amendment when they reassigned him allegedly in retaliation for his use of protected speech in writing the word "negro" on the board during a Spanish lesson. Defendant contends that Erskine's speech is not afforded constitutional protection because it was not speech by a citizen on a matter of public concern and that, in any event, Erskine suffered no adverse action. It will only be necessary to address the first contention.

■■■ "The initial question is deciding a public employee's entitlement to the protection of the first amendment is whether his speech addresses a matter of public concern." *Seemuller v. Fairfax County School Board,* 878 F.2d 1578, 1581 (4th Cir.1989), *citing Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). The speech of public employees "upon matters only of personal interest" is not protected by the constitution. *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). However:

> to determine whether a government employee's speech was protected expression entail[s] striking "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*DiMeglio v. Haines,* 45 F.3d 790, 804–805 (4th Cir.1995), *quoting Connick,* 461 U.S. at 142, 103 S.Ct. 1684 (internal quotations omitted); *see also Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■■■ "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–148, 103 S.Ct. 1684. Erskine states

that, in writing the word "negro" on the board he was merely implementing a school approved lesson plan. Paper no. 15, at 8. At the time, he was speaking not as a citizen voicing his own opinion, but as an employee. "Although the Court had not expressly held that speech uttered within the employee's public capacity was not protected, the Court had distinguished between speaking as a citizen and as an employee, and had focused on speech as a citizen as that for which constitutional protection is afforded." *DiMeglio,* 45 F.3d at 805 (4th Cir.1995), *citing Connick,* 461 U.S. at 147, 103 S.Ct. 1684. Communications made "in the course of carrying out legitimate job duties" and "between employees speaking as employees" are not of public concern. *Holland v. Rimmer,* 25 F.3d 1251, 1255–56 (4th Cir.1994).

In writing the word on the board, Erskine was speaking as an employee directly in the role of his employment and was, by his own admission, "carrying out the express directions of his employer." Paper no. 15, at 8. To the extent, if any, that Erskine was disciplined for the use of certain speech in the classroom, that speech was not protected because he was not speaking as a citizen on a matter of public concern. Accordingly, summary judgment will be granted as to Count I.

### B. Count II: Discriminatory discipline

■ Erskine cannot bring a Title VII action against the individual supervisors. In *Lissau v. Southern Food Service, Inc.,* 159 F.3d 177, 180 (4th Cir.1998), the Fourth Circuit held that individual supervisors are not the "employer" or the "employer's agent" within the meaning of the statute, 42 U.S.C. § 2000e–2(a), and are not liable under Title VII. Accordingly, summary judgment will be granted as to Count II in favor of the individual Defendants, Sterling Marshall, Susan DePlatchett and Paul Lewis.

The only claim under Title VII, then, remains against the Board of Education. Defendants dispute again whether Plaintiff suffered any adverse employment action[1] and argue also that there is no evidence of discriminatory animus. Erskine does not allege that there is any direct evidence of racial discrimination on the part of Defendant, so his claims will be analyzed under the burden shifting scheme set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■■ The test for discriminatory discipline is set forth in *Cook v. CSX Transportation Co.,* 988 F.2d 507 (4th Cir.1993). In order to make out a *prima facie* case that discipline was discriminatory, the Fourth Circuit requires an employee to show: 1) that he is a member of a protected class; 2) that his misconduct was of comparable seriousness to the misconduct of employees not within the protected class; and 3) the discipline imposed upon the plaintiff was more severe than that imposed upon the similarly situated employees. *Cook,* 988 F.2d at 511, *citing Moore v. City of Charlotte,* 754 F.2d 1100 (4th Cir.1985). Once a Plaintiff establishes a *prima facie* case, the Defendant must present a legitimate, non-discriminatory reason for the adverse employment action alleged.

---

1. For the purposes of summary judgment, the court will assume that Erskine's reassignment constitutes an adverse employment action.

*Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 607 (4th Cir.1999). Plaintiff retains the ultimate burden of proving by a preponderance of the evidence that the real reason for the employment decision at issue was unlawful discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000).

■ In order to make out a *prima facie* case under *Cook,* Plaintiff must establish that he was disciplined for certain conduct while similarly situated employees who are not in his protected class were not similarly disciplined for like conduct. *See Moore,* 754 F.2d at 1107–11. While the conduct does not have to be identical, the similarly situated employee must have engaged in conduct of "comparable seriousness." *Cook,* 988 F.2d at 511. In his deposition, Erskine recalls hearing on several occasions, though he does not recount any specific instances, in which African–American teachers at the school used the word "nigger." The teachers allegedly using the word were never disciplined by the school. Erskine maintains that, unlike these other teachers, he was subjected to an investigation and disciplined with a reassignment for writing the word "negro", the Spanish word for black, on the chalkboard in the process of a Spanish lesson.

These other teachers, however, did not commit like offenses. Defendants set forth evidence that an earlier complaint had been lodged against Erskine prior to the blackboard incident and that the investigation did not arise solely from his alleged use of a racial epithet. Erskine does not dispute that this earlier complaint was lodged. Additionally, he sets forth no evidence that the teachers allegedly using the word "nigger" in the presence of students were the subject of any similar complaints from students or parents or that the school failed to react to similar complaints against other teachers. Therefore, Erskine does not forecast sufficient evidence that the African–American teachers engaged in conduct of the type that led to Erskine's reassignment. Accordingly, he cannot make out a *prima facie* case of discriminatory discipline and so summary judgment will be granted as to Count II.

### C. Count III: Due Process claim

■ Erskine claims that Defendants deprived him of property without sufficient due process when they reassigned him as a substitute in a different school.[2] Defendants contend that Erskine was put on notice of the concerns/charges that he had failed to interact appropriately with his students in the classroom and that he was given an opportunity to address these concerns at the April 29, 1997, meeting. Erskine argues, in contrast, 1) that the meeting did not occur until after he was pulled from his classroom and 2) that it did not provide adequate due process because he was informed that the complaints against him were unfounded and was never shown any evidence which would allow meaningful rebuttal.

■ Erskine's procedural due process claim depends on his having had a property right in his continued employment and he was deprived of that right. *Cleveland Bd. of Educ. v. Loudermill,* 470

---

**2.** In his complaint, Erskine also alleges that Defendants denied him a liberty interest in his reputation. Erskine does not address this allegation in his opposition to Defendants' motion. Furthermore, "[h]arm or injury to a plaintiff's interest to his reputation does not result in the deprivation by a state of a plaintiff's due process 'liberty' or 'property' " interests. *Walker v. City of Salisbury,* 170 F.Supp.2d 541, 547 (D.Md.2001), *citing Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Accordingly, even were he to support them, Erskine's allegations of reputational harm could not prove his claim.

U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), *citing Board of Regents v. Roth,* 408 U.S. 564, 576–578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "The protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected 'property' interest." *Gilbert v. Homar,* 520 U.S. 924, 928, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). Whether a person has a legitimate claim of entitlement in a benefit "must be decided by reference to state law, *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), as evidenced by state statutes, local ordinances, rules or mutually explicit understandings that support the claim." *Beckham v. Harris,* 756 F.2d 1032, 1036 (4th Cir.1985), *citing Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

Defendants do not challenge Erskine's contention that he has a property interest in his continued public employment. Paper no. 14, at 14. They contend instead that his property interest in his employment was never taken away from him through his reassignment and, in any case, he received sufficient due process through a "pre-deprivation" hearing prior to his reassignment. It is not certain that the protections of the Due Process Clause extend either to non-tenured public employees or to the discipline of public employees short of termination. In *Gilbert v. Homar,* 520 U.S. 924, 929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), the Court assumed, explicitly without deciding, that a suspension without pay "infringed a protected property interest" because that point had not been contested by the petitioners. Unlike in *Homar,* here Defendants do contend that Erskine's property interest in his employment was never deprived through the reassignment. However, in light of the unsettled question as to whether such

a reassignment would trigger the need for constitutional due process protection, the court, like in *Homar,* will turn immediately to Defendants' contention that Erskine "received all the process he was due."

Public employees do not automatically have a property interest in their employment. However, once a state legislature elects to " 'confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.' " *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487, *quoting Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)(Powell, J., concurring in part and concurring in result in part). The standard for "appropriate procedural safeguards" is not explicit. For example, in *Roth,* 408 U.S. at 569–570, 92 S.Ct. 2701, the Court held merely that "some kind of hearing" is required before the discharge of an employee. Due process is a flexible standard and "is not a technical conception with a fixed content unrelated to time, place and circumstance." *Homar,* 520 U.S. at 930, 117 S.Ct. 1807, *quoting Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). In order to determine what process is due, the court balances three factors:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see also Logan v. Zimmerman Brush Co.,* 455 U.S.

422, 434, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

■ Looking at the first part of this balancing test, the property interest, if any, deprived by Erskine's reassignment was relatively insubstantial. The Supreme Court has "recognized the severity of depriving some one of the means of his livelihood," *Homar,* 520 U.S. at 932, 117 S.Ct. 1807, *citing FDIC v. Mallen,* 486 U.S. 230, 243, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988). However, the Court has "also emphasized that in determining what process is due, account must be taken of 'the *length* ' and '*finality* of the deprivation' ". *Id.,quoting Logan,* 455 U.S. at 434, 102 S.Ct. 1148. Unlike the employee in *Loudermill,* who faced termination, or even the employee in *Homar,* who faced a temporary suspension without pay, Erskine was not even suspended and did not suffer a loss in pay. The deprivation of property here was slight at best.

Second, the procedures used by Defendants are adequate given the slight deprivation suffered by Erskine. Initially, Erskine argues that the April 29 meeting could not have been a pre-deprivation hearing because he was pulled from class before it occurred. The Court "has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide pre-deprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Homar,* 520 U.S. at 930, 117 S.Ct. 1807. Erskine had been informed of a student complaint several days prior to the blackboard incident and advised not to do anything construed as derogatory. He was pulled from class after DePlatchett received reports about the blackboard incident. In light of the earlier complaint, it was reasonable that she move quickly. Furthermore, at the stage when Erskine had been temporarily pulled from class

with no change in status or pay, but not yet reassigned, only the slightest possible deprivation of his property, if any, occurred. To the extent that a hearing was required to comport with due process requirements, the April 29 meeting provided an adequate procedural safeguard for this threshold deprivation because it occurred before the decision was made to reassign Erskine.

Erskine maintains that the procedures used at the April 29 meeting were inadequate because he was not shown specific evidence and so was unaware even of the existence of charges against him. However, "[d]ue process does not mandate that all evidence on a charge or even the documentary evidence be provided, only that such descriptive evidence be afforded as to permit [the plaintiff] to identify the conduct giving rise to the dismissal and thereby, to enable him to make a response." *Linton v. Frederick County Bd. of County Commissioners,* 964 F.2d 1436, 1440 (4th Cir.1992). In *Linton,* the Fourth Circuit held that the county provided sufficient pre-termination procedures where there was no evidence in the record that the plaintiff did not understand the charges at the time and he did not contest their veracity later.

The evidence demonstrates that Erskine was apprised of the complaints against him and the purpose of the April 29 meeting was for Erskine to have an opportunity to explain what occurred in several incidents. Paper no. 15, Ex. C, at 69–70. Erskine's contention that he was informed that the complaints against him were groundless is erroneous and arises from his mischaracterization of the charges against him. Despite evidence that Erskine was aware that the investigation arose from multiple complaints, at least some occurring before the blackboard incident, Erskine insists that the actions taken against him arose only

from the blackboard incident and that the purpose of the meeting was solely to address that incident. The April 29 meeting covered at least some concerns with Erskine's conduct having nothing to do with the blackboard incident. Paper no. 14, Ex.1, attached notes from April 29 meeting. Erskine admits that, in addition to the blackboard incident, he was asked at the meeting to discuss his educational philosophy and to explain several statements he had allegedly made. Paper no. 15, Ex. C, at 69–70. Further, at the April 15 meeting with Lewis and his vice-principal, Erskine had been apprised of a student complaint containing several allegations arising before the blackboard incident even occurred. Paper no. 15, at 2, Ex. C, at 22–26; Ex. E. Erskine's contentions that he was informed that any evidence supported his version of events, while possibly true with reference to the blackboard incident, is not accurate with respect to the subject matter of the hearing as a whole.

Especially given the relatively insubstantial nature of the deprivation suffered by Erskine, he was not entitled to the presentation of more specific evidence against him. Weighed against Defendants' significant interest in creating a positive learning environment for the students in their care, it was sufficient that Erskine was informed of the complaints and given an opportunity to defend his actions. Accordingly, summary judgment will be granted as to Count III.

## IV. Conclusion

For the foregoing reasons, the court will grant Defendants' motion for summary judgment. A separate order will be entered.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this _____ day of April, 2002, by the United States District Court for the District of Maryland, ORDERED that:

1. Defendant's motion for summary judgment under Fed.R.Civ.P. 56 BE, and the same hereby IS, GRANTED as to all counts;

2. JUDGMENT BE, and the same hereby IS, ENTERED in favor of Defendants, and against Charles Erskine, on all counts;

3. The Clerk transmit copies of the Memorandum Opinion and this Order to counsel for the parties and CLOSE this case.